BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
Albert Y. Chang (296065)
Yury A. Kolesnikov (271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
E-mail:       fbottini@bottinilaw.com
              achang@bottinilaw.com
              ykolesnikov@bottinilaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MONICA RODRIGUEZ ELPIDIO and MARIA J. BARAHONA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY; SFPP, L.P. (formerly known as SANTA FE PACIFIC PIPELINES, INC.); KINDER MORGAN OPERATING L.P. "D", and KINDER MORGAN G.P., INC.,<br><br>Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br><br><br> **DEMAND FOR JURY TRIAL** |

1       Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Monica Rodriguez

2   Elpidio and Maria J. Barahona, on behalf of themselves and all others similarly situated, make the

3   following allegations, except as to allegations pertaining to Plaintiffs, based on their investigation

4   and the investigation of their counsel, including a review of legal and regulatory filings, press

5   releases, media reports about Defendants, relevant court decisions, and other publicly-available

6   information about Defendants.  Plaintiffs believe that substantial additional evidentiary support

7   will exist for the allegations set forth herein after a reasonable opportunity for discovery.

8                    **NATURE OF THE ACTION**

9       1.     Beginning in approximately 1850, Congress embarked upon a policy of subsidizing

10  railroad construction by paying for it with lavish grants from the public domain.  These initial

11  "Congressional Acts" granted vast areas of land to several transcontinental railroads, including to

12  the predecessor-in-interest of Defendant Union Pacific Railroad Company, encouraging them to

13  build tracks across the nation.  Some of the land was transferred to the railroads as their own

14  property, to sell and finance their progress in constructing and running the railroad.  Other parts

15  were granted as rights-of-way over the surface upon which to build tracks and related structures.

16       2.     While the early grants could be considered "lavish," they did have strings attached.

17  The railroads were not given full fee title.  The land had to be used for legitimate "railroad

18  purposes."  If a railroad ceased to use the land for railroad purposes, it would revert to the

19  government or its grantees, if any.  Thus, at most, "the railroads received all *surface* rights to the

20  right of way and all rights incident to a use *for railroad purposes*."[1]

21       3.     Notably, the initial Congressional Acts did not purport to convey — and did not

22  convey — any *subsurface* rights beyond those necessary for "railroad purposes."  For example,

23  starting with the act of 1864, *see* Act of July 2, 1864, ch. 216, § 1–22, 13 Stat. 356, the federal

24  government expressly retained rights to the "mineral lands," with the exception of coal and iron.

25       4.     In 1875, Congress passed the General Right-of-Way Act, 18 Stat. 482, 43 U.S.C.

26

27      [1] *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 119 (1957) ("*Union Pacific Railroad*") (emphases added).

28

§ 934 *et seq.*, which provided railroads with further rights-of-way through public lands for the construction of a railroad.  But now Congress made it clear that it was providing the railroads with mere "easements" over the land on which they could lay their tracks and run their trains.  Railroads were given no fee interest in the property itself.  Instead, the title to the property remained in the federal government or its grantees, if any.

5.     Plaintiffs are owners, in fee simple, of parcels of land that are adjacent to or crossed by a railroad corridor belonging to Defendant Union Pacific Railroad Company ("Union Pacific").  Unbeknownst to Plaintiffs, beginning in the mid-1950s, Union Pacific's predecessor entered into agreements with predecessors of Defendants SFPP, L.P. ("SFPP"), Kinder Morgan Operating, L.P. "D" ("Kinder Morgan D"), and Kinder Morgan G.P., Inc. ("Kinder Morgan GP"), whereby Union Pacific's predecessor granted easements to those companies in the subsurface underlying the railroad's right-of-way in order for those companies to run their pipelines, which carried oil, gas, and other petroleum products across the western United States.

6.     Union Pacific's predecessor granted the aforementioned easements despite knowledge that it might not have had sufficient property interest to do so.  For example, in one 1974 letter, an in-house attorney for Union Pacific's predecessor wrote regarding a proposed pipeline easement in Contra Costa County, saying, "[n]o assurance can be given Railroad is entitled to grant the pipeline easement in view of the unfavorable trend of California decisions interpreting grants to railroad companies."  Another letter by the same in-house attorney written in 1976 discussed the fact that upon abandonment of rail operations, the limited title properties may result in reversion of title, and that the easements are subject to loss upon abandonment for railroad purposes.  The letter concluded that "consideration need be given as to the advisability of granting to [the pipeline companies] an easement for pipelines in the property classified as limited title and easement for railroad purposes … unless it is feasible for Railroad to take steps necessary to establish that it is the fee owner of the right of way in which [the] pipeline is located."  Despite the foregoing concerns, Union Pacific's predecessor continued to grant easements to the pipeline companies.

7.     Plaintiffs bring this action on behalf of themselves and all other similarly-situated

CLASS ACTION COMPLAINT

landowners in California who own, in fee simple, land adjacent to and underlying the railroad easement under which the pipeline is located.  Plaintiffs seek a declaration that (1) Union Pacific lacks sufficient legal right or title in the subsurface of its right-of-way to grant easements or to collect rents associated with the occupancy of the subsurface, and (2) SFPP, Kinder Morgan D, and Kinder Morgan GP lack sufficient legal right or title to occupy the subsurface of the railroad's right-of-way.  Plaintiffs also seek to quiet title in the subsurface real property in Plaintiffs' and the Class members' respective names, free and clear of any claimed interest by Defendants.  Due to Defendants' unlawful and unfair use of — and profit from — Plaintiffs' and the Class members' subsurface rights, Plaintiffs further seek an award of damages, restitution, and/or disgorgement of benefits or profits received by Union Pacific and for a constructive trust in favor of Plaintiffs to be placed upon the benefits and proceeds received by the Defendants.

**JURISDICTION AND VENUE**

8.     Jurisdiction is proper under 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiffs and Defendants, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     Jurisdiction is also proper under 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one defendant.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (a) a substantial part of the events giving rise to this dispute occurred in this District; and (b) Defendants do business in the State of California and in this District and are subject to personal jurisdiction in the State of California.  Defendants therefore reside in this District for venue purposes pursuant to 28 U.S.C. § 1391(c)(2).

11.     The real property which forms the subject matter of this action is located in the State of California.

12.     The conduct complained of herein occurred, in whole or in part, within the State of California and/or was directed at residents and citizens of the State of California.

CLASS ACTION COMPLAINT

**INTRADISTRICT ASSIGNMENT**

13.     This action should be assigned to the San Francisco/Oakland division of this Court because a substantial portion of the events giving rise to this action occurred in Contra Costa County.

**PARTIES**

14.     Plaintiff Monica Rodriguez Elpidio is an individual resident and citizen of the State of California, and is the owner in fee simple of a parcel of land located in Contra Costa County, California, assessor parcel number 067-271-011-8.  The parcel of land is adjacent to or crossed by a railroad corridor.   One or more of Defendants entered upon that land, excavated it, and constructed a pipeline to run below ground, beneath the railroad's right-of-way.

15.     Plaintiff Maria J. Barahona is an individual resident and citizen of the State of California, and is the owner in fee simple of a parcel of land located in Contra Costa County, California, assessor parcel number 068-115-008-2.  The parcel of land is adjacent to or crossed by a railroad corridor.   One or more of Defendants entered upon that land, excavated it, and constructed a pipeline to run below ground, beneath the railroad's right-of-way.

16.     Defendant Union Pacific Railroad Company ("Union Pacific"), successor to Southern Pacific Transportation Company, is a Delaware corporation with its principal place of business in Omaha, Nebraska.

17.     Defendant SFPP, L.P. ("SFPP"), formerly known as Santa Fe Pacific Pipelines, Inc., is a limited partnership.  Upon information and belief, the partners of SFPP are citizens of the States of Texas and/or Delaware.

18.     Defendant Kinder Morgan Operating L.P. "D" ("Kinder Morgan D") is a limited partnership.  Upon information and belief, the partners of Kinder Morgan D are citizens of the States of Texas and/or Delaware.

19.     Defendant Kinder Morgan G.P., Inc. ("Kinder Morgan GP"), is a corporation. Kinder Morgan GP is incorporated in the State of Delaware and maintains its principal place of business in the State of Texas.

20.     Defendants SFPP, Kinder Morgan D, and Kinder Morgan GP are collectively

4

1  referred to as the "Pipeline Entities."

2  <center>**FACTUAL ALLEGATIONS**</center>

3  **I.      Congress Grants Rights-of-Way to Railroads in the 19th Century**

4       21.      Beginning in approximately 1850, Congress embarked upon a policy of subsidizing

5  railroad construction by paying for it with large land grants from the public domain.

6       22.      President Abraham Lincoln signed the Pacific Railroad Act on July 1, 1862, *see*

7  Railroad Act of 1862, ch. 120, §§ 1–20, 12 Stat. 489, and subsequent acts were signed by him and

8  his successors.  *See* Act of July 2, 1864, ch. 216, §§ 1–22, 13 Stat. 356; 30 U.S.C. § 21; General

9  Right-of-Way Act of 1875, 18 Stat. 482, 43 U.S.C. § 934 *et seq.*

10      23.      These Congressional Acts granted vast areas of land to several transcontinental

11  railroads, including Union Pacific, encouraging them to build tracks across the nation.

12      24.      Some of the land was transferred directly to the railroads as railroad property, to

13  sell and finance their progress.

14      25.      Other parts of the land were granted as rights-of-way over the surface upon which

15  to build tracks and related structures.

16      26.      In the same year that he signed the Pacific Railroad Act of 1862, President Lincoln

17  signed the Homestead Act, *see* Ch. 75 §§ 1–8, 12 Stat. 392, which granted large swaths of land to

18  settlers, who owned and developed the land near, and with the help of, the railroads.

19      27.      Railroads also obtained easements from private individuals for use and access to

20  private lands that were subject to the restriction that the land be used solely for railroad purposes.

21  Such private easements also only granted surface rights to the railroads.

22      28.      In 1864, in the second major railroad act, the government amended the Pacific

23  Railroad Act of 1862, reiterating that the government retained rights to the "mineral lands," with

24  the exception of coal and iron.  *See* Act of July 2, 1864, ch. 216, § 1–22, 13 Stat. 356.  In 1866,

25  Congress passed a law providing that "[i]n all cases lands valuable for minerals shall be reserved

26  from sale, except as otherwise expressly dictated by law."  30 U.S.C. § 21.

27      29.      In 1875, Congress passed the General Right-of-Way Act of 1875, 18 Stat. 482, 43

28  U.S.C. § 934 *et seq.*, granting the railroads additional rights-of-way, but clarifying that the

<center>5</center>

1   government was providing the railroads with mere "easements" over the land on which they could

2   lay their tracks and run their trains, but that title remained in the federal government.

3          30.    With the advent of the internal combustion engine, the need for railroads

4   diminished and the railroads sold, abandoned, or discontinued much of their tracks.

5          31.    In response, Congress enacted laws governing the disposition of abandoned or

6   forfeited railroad rights-of-way, which provided that any transfer would "be subject to and contain

7   reservations in favor of the United States of all oil, gas, and other materials in the land."  43 U.S.C.

8   § 912.  When pipelines appeared on the scene, carrying oil, gas, and other fuels, Congress passed

9   laws governing subsurface oil and gas pipelines through federal lands, providing for annual rental

10  payments to the government.  *See, e.g.*, 30 U.S.C. § 185 *et seq*.  Congress also passed a law providing

11  that the government could grant leases for oil and gas deposits "in or under lands embraced in

12  railroad or other rights of way acquired under any law of the United States, whether the same be a

13  base fee or mere easement."  30 U.S.C. § 301 *et seq*.

14  **II.    The Limited Scope of Rights Granted to the Railroads by Congress**

15         32.    The Congressional land acts and easements by private grant only granted the

16  railroads surface easements for railroad purposes, and expressly reserved and did not convey rights

17  to the subsurface real property that is below the railroad's right-of-way.

18         33.    For example, while the pre-1871 Congressional grants could be considered

19  "lavish," they did have strings attached.  The railroads were not given full fee simple title.  The land

20  had to be used for legitimate "railroad purposes."  If a railroad ceased to use the land for railroad

21  purposes, it would revert to the government or its grantees, if any.  Thus, at most, "the railroads

22  received all *surface* rights to the right of way and all rights incident to a use *for railroad purposes*."[2]

23         34.    Notably, the initial Congressional Acts did not purport to convey — and did not

24  convey — any *subsurface* rights beyond those necessary for "railroad purposes."  For example,

25  starting with the act of 1864, *see* Act of July 2, 1864, ch. 216, § 1–22, 13 Stat. 356, the federal

26

27         ───────────────

28         [2] *Union Pacific Railroad,* 353 U.S. at 119 (emphases added).

6

government expressly retained rights to the "mineral lands," with the exception of coal and iron. Thus, the railroads had the right to extract from the subsurface only such minerals as were necessary for the construction and operation of the railroads.

35.     In 1875, Congress passed the General Right-of-Way Act, 18 Stat. 482, 43 U.S.C. § 934 *et seq.*, which provided railroads with further rights-of-way through public lands for the construction of a railroad.  But now Congress made it clear that it was providing the railroads with mere "easements" over the land on which they could lay their tracks and run their trains.  Railroads were given no fee simple interest in the property itself.  Instead, the title to the property remained in the federal government or its grantees, if any.  Railroads were also given the right to use the subsurface only as necessary to support the surface operations of the railroads.

**III.     Pipeline Easements Granted by Union Pacific's Predecessor**

36.     Union Pacific currently operates a railroad transportation system in 23 states west of the Mississippi River, totaling roughly 32,400 miles, including within the State of California.

37.     Approximately half of Union Pacific's railroad tracks in the western part of the United States, including within California, were obtained by and through one of the Congressional land grants.  The remainder of Union Pacific's tracks in the western part of the United States, including within California, were obtained by purchase or by easements through private grants.

38.     In the mid-1950s, Union Pacific's predecessor and the Pipeline Entities' predecessor were sister subsidiaries of Southern Pacific Corporation.

39.     Union Pacific's predecessor possessed a valuable transportation corridor along the rights-of-way granted to it initially by acts of Congress.  The Pipeline Entities' predecessor wished to obtain a longitudinal easement through which to run its pipelines, which carried petroleum products.  To accomplish this, the two sister companies entered into master agreements in 1955 and 1956, wherein Union Pacific's predecessor rented portions of the subsurface under its rights-of-way, in Western states, including within California, to the Pipeline Entities' predecessor.

40.     In the 1950s, the Pipeline Entities' predecessor began constructing oil and gas pipelines to run below ground, beneath the railroad's right-of-way.

41.     The Pipeline Entities now own approximately 1,871 miles of pipeline running

1   through California, Arizona, Nevada, New Mexico, Texas, and Oregon within Union Pacific's

2   right-of-way. Another 1,400 miles run through public and private lands. The system distributes

3   refined petroleum products (principally diesel, all grades of gasoline, and jet fuel).

4       42. Union Pacific's predecessor granted the aforementioned easements — and the

5   Pipeline Entities' predecessor accepted the same — despite significant controversy as to whether

6   Union Pacific's predecessor had any right to convey the subject easements.

7       43. In 1957, the Supreme Court of the United States issued its seminal opinion in *Union*

8   *Pacific Railroad*, 353 U.S. at 112. There, the federal government sued the Union Pacific Railroad

9   Company, seeking to enjoin it from extracting oil and gas from the subsurface under a pre-1871

10  right-of-way. The Supreme Court sided with the federal government, holding that while under the

11  pre-1871 Acts a railroad was entitled to full use of the surface of the land, it could only use the

12  subsurface "'for railroad purposes.'" *Id.* at 114 & n.1. The Supreme Court held that because the

13  extraction of minerals from the subsurface was not a railroad purpose, and was expressly reserved

14  in the statute, the pre-1871 Acts did not provide the railroad with the right to do so.

15      44. Even Union Pacific's in-house counsel questioned the ability of the railroad to

16  grant easements to the pipeline companies. For example, in one 1973 letter, an in-house attorney

17  for Union Pacific's predecessor acknowledged that recent federal court decisions bearing on "the

18  extent of the rights granted to Railroad under the March 3, 1871 Act now appear to be more

19  restrictive as to use of the right-of-way for other than railroad purposes" than previously believed.

20  In a similar 1974 letter, the attorney wrote regarding a proposed pipeline easement in Contra Costa

21  County, saying, "[n]o assurance can be given Railroad is entitled to grant the pipeline easement in

22  view of the unfavorable trend of California decisions interpreting grants to railroad companies."

23  Another letter by the same in-house attorney written in 1976 discussed the fact that upon

24  abandonment of rail operations, the limited title properties may result in reversion of title, and that

25  the easements are subject to loss upon abandonment for railroad purposes. The letter concluded

26  that "consideration need be given as to the advisability of granting to [the Pipeline Entities] an

27  easement for pipelines in the property classified as limited title and easement for railroad purposes

28  … unless it is feasible for Railroad to take steps necessary to establish that it is the fee owner of the

CLASS ACTION COMPLAINT

1    right of way in which [the] pipeline is located."

2        45.     Despite the foregoing concerns, Union Pacific's predecessor continued to grant

3 easements to the Pipeline Entities' predecessor to construct an underground pipeline within the

4 subsurface underlying the railroad's right-of-way.

5        46.     The pipelines were built underneath the railroad's rights-of-way irrespective of

6 what ownership interest the railroad had actually acquired in this subsurface real property pursuant

7 to pre-1871 Acts of Congress or the 1875 Act, and irrespective of the fact that the railroad only

8 acquired a surface easement for its railroad purposes and had no legal rights to occupy the

9 subsurface or to grant subsurface easements for purposes of constructing or operating the pipeline.

10        47.     In 1983, Union Pacific's predecessor and the Pipeline Entities' predecessor entered

11 into a new master agreement addressing the easements. The new master agreement revised the

12 arrangement regarding the Pipeline Entities' perpetual, nonexclusive easements, and it set forth the

13 amount of rent to be paid for existing pipeline easements through 1993.

14        48.     Also in 1983, Southern Pacific, the parent company of Union Pacific's predecessor

15 and the Pipeline Entities' predecessor, announced a merger with Santa Fe Railroad.

16        49.     Ultimately, the Interstate Commerce Commission disapproved of the consolidation

17 of the two railroads and required Union Pacific's predecessor to be sold to a third party resulting in

18 Union Pacific and the Pipeline Entities no longer being sister subsidiaries.

19        50.     In 1991, Union Pacific's predecessor sued the predecessor of the Pipeline Entities,

20 alleging that the 1983 agreement should be rescinded because it was created while the companies

21 were still sister entities and because it was not negotiated at arm's length, meaning that an

22 artificially-low rent amount was established for the Pipeline Entities' easements.

23        51.     The 1991 lawsuit was settled in April of 1994 by virtue of a settlement agreement,

24 which provided that the 1983 easement rental agreement was rescinded, the purported pipeline

25 easement rights were confirmed, the parties compromised various existing claims, and the Pipeline

26 Entities' predecessor paid over $5 million in return for dismissal of claims and causes of action.

27        52.     In July of 1994, Union Pacific's predecessor and the Pipeline Entities' predecessor

28 entered into an amended and restated easement agreement ("AREA"), which purported to state

1    that Union Pacific's predecessor granted easements to the Pipeline Entities' predecessor for the

2    transportation of its petroleum, natural gas, and other products, and reiterated a procedure and

3    mechanism to determine the amount of rent that the Pipeline Entities' predecessor would pay to

4    Union Pacific's predecessor for what purported to be perpetual easements in the subsurface of the

5    right-of-way.

6          53.     The next stage of litigation between Union Pacific and the Pipeline Entities

7    commenced in 2004.  In April of 2012, after more than 250 trial days, a trial court in Los Angeles,

8    California found that pursuant to the AREA, the base annual rent owed from the Pipeline Entities

9    to Union Pacific commencing on January 1, 2004 was $14,080,487.00; that back rent due as of the

10   time of the judgment was $81,589,584.00; and that pre-judgment interest was payable by the

11   Pipeline Entities to Union Pacific in the amount of $19,372,195.50.

12         54.     The Pipeline Entities appealed the judgment.   On November 5, 2014, the

13   California Court of Appeal for the Second District affirmed in part and reversed in part and

14   remanded.  *See Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal. App. 4th 134 (2014)

15   ("*Santa Fe Pacific*").

16         55.     The California Court of Appeal held that the pre-1871 and 1875 Congressional

17   Acts did not, by themselves, convey a sufficient property interest to Union Pacific's predecessor to

18   justify its collecting rent on the Pipeline Entities' subsurface easements.

19         56.     Because the Congressional acts alone did not provide Union Pacific with sufficient

20   property rights to rent the subsurface to the Pipeline Entities, the Court of Appeal held that in

21   some instances Union Pacific was seeking to collect rent for the use of property owned by others

22   — either private third parties or the federal government (or its grantees).

23   **IV.   The Easements Granted by Union Pacific Were Unlawful and Unfair**

24         57.     The original Congressional grants expressly described their purpose as granting the

25   lands and/or rights-of-way to the railroads for "railroad purposes" only.  For example, the original

26   Pacific Railroad Act of 1862 was passed "to lay out, locate, construct, furnish, maintain, and enjoy

27   a continuous railroad and telegraph, with the appurtenances" and to "aid[ ] in the construction of

28   [the] railroad and telegraph line."   Ch. 120, §§ 1, 3, 12 Stats. 489.  The Act of July 2, 1864 was

meant for the "construction and working of said road."  Ch. 216, § 3, 13 Stats. 356.  And the Act of July 25, 1866 required the railroad companies "to operate and use the portions or parts of said railroad and telegraph … for all purposes of transportation, travel, and communication, so far as the government and public are concerned."  Ch. 242, § 7, 14 Stats. 239.

58.    The easements granted by Union Pacific's predecessor to the Pipeline Entities' predecessor for construction of pipelines to carry petroleum products are clearly not for "railroad purposes."  For something to be a railroad purpose, it must at least be used to construct and operate a railroad or to be used for such purpose as is necessary and incident to railroad construction, maintenance, and operation.  A subsurface petroleum pipeline serves none of these purposes.  Rather, in the words of the California Court of Appeal, "a subsurface petroleum pipeline is clearly an 'abnormal development' *not* encompassed by the original [Congressional] grant, which increases the burden on the servient tenement."  *Santa Fe Pacific,* 231 Cal. App. 4th at 164 (emphasis added).  Indeed, "one would have to engage in a terrible distortion of law and logic to find that somehow the railroad, not the government or its grantees, obtained the rights to the subsurface underneath its rights-of-way to do with it as it saw fit — especially when a railroad purpose must be something that furthers the goal of the legislative enactment, not something that merely serves the economic interests of a private company."  *Id.* at 174.

59.    In sum, "[t]here is nothing in the statutory language, nor its content or context that remotely suggests that Congress meant to give the railroads the right to use the land under their rights-of-way to generate revenue for themselves."  *Id.* at 175.

60.    Union Pacific's use of — or its grant of easements to the Pipeline Entities for the use of — the right-of-way that was limited to railroad purposes to carry petroleum through a subsurface pipe was an improper and illegal use outside the scope of Union Pacific's easement, which terminated Union Pacific's easement.  The Pipeline Entities' use of the subsurface of the right-of-way to convey petroleum products may be severed from the surface railroad use and terminated.

61.    The purported easement agreements granted by Union Pacific's predecessor to the Pipeline Entities' predecessor were and are invalid.  As a result, Defendants have been trespassing

11

1  on Plaintiffs' fee ownership in the subsurface of the right-of-way for over 50 years without

2  payment to all of the adjacent landowners who own the fee in the right-of-way.

3     62.   Defendants have been unjustly enriched for over 50 years by, in Union Pacific's

4  case, collecting rent from the Pipeline Entities that it had no right to collect, and, in the Pipeline

5  Entities' case, by developing a commanding share of the oil and gas market through the use and

6  occupancy of the pipeline without the consent of Plaintiffs and the Class and without

7  compensation to them.

8     63.   Upon information and belief, the Pipeline Entities received a very favorable price

9  from Union Pacific because Union Pacific knew that it did not have the right to grant easements to

10 construct an underground pipeline within the subsurface underlying the railroad's right-of-way.

11    64.   Defendants' wrongful conduct is ongoing and continuing, and has caused and

12 continues to this day to cause harm to Plaintiffs and the Class.

13    65.   Upon information and belief, as early as the 1950s, Union Pacific's predecessor-in-

14 interest recognized that it did not have sufficient legal title to purportedly grant an easement within

15 the subsurface of the railroad's right-of-way to construct and operate an oil and gas pipeline.

16    66.   Upon information and belief, employees, agents, or representatives of Union

17 Pacific's predecessor-in-interest recommended that the company justly compensate the true fee

18 owners of the subsurface — i.e., Plaintiffs and the Class members — which Union Pacific's

19 predecessor-in-interest wrongfully failed and refused to do.

20    67.   Upon information and belief, Union Pacific's predecessor knowingly engaged in a

21 plan, conspiracy, and scheme with the Pipeline Entities to unlawfully deprive Plaintiffs and the

22 Class members of their property rights by granting the right to construct an oil and gas line within

23 the subsurface of the railroad's right-of-way in excess of the railroad's legal rights and without due

24 notice or compensation to Plaintiffs and the Class members for such use and occupancy.

25    68.   Upon information and belief, the Pipeline Entities have recognized for decades that

26 Union Pacific lacked sufficient title to convey easements to the Pipeline Entities in tracts of land

27 that were granted to Union Pacific pursuant to Congressional Acts, but have knowingly and

28 deliberately conspired with the other Defendants to transmit petroleum products through

1    Plaintiffs' and the Class members' real property and withhold rents from the lawful owners of the

2    subsurface that they wrongfully used and/or occupied.

3        69.    Defendants are legally sophisticated entities that thoroughly researched,

4    investigated, and assessed the nature of their purported legal rights and claims to the subsurface of

5    the railroad's rights-of-way, and, upon information and belief, knew that they had no legal right to

6    use, occupy, or profit from the subsurface real property that is owned by Plaintiffs.

7        70.    Defendants, at all times relevant hereto, misrepresented and/or concealed from

8    Plaintiffs the facts regarding the presence of the pipeline on Plaintiffs' real property and the nature

9    of Defendants' supposed legal rights to use, occupy, or profit from the subsurface of the railroad's

10   rights-of-way.

11       71.    Plaintiffs were wrongfully deterred from filing their causes of action against

12   Defendants by virtue of Defendants' wrongful conduct in concealing the true facts and wrongfully

13   and dishonestly misleading Plaintiffs as to the nature of Plaintiffs' rights, despite Defendants'

14   knowledge that they had no right to occupy the subsurface of Plaintiffs' real property.

15       72.    The pipeline was constructed underground, in some cases 40 to 60 feet below the

16   surface.

17       73.    Defendants' use and occupancy of the subsurface of the railroad's rights-of-way

18   was hidden or concealed from Plaintiffs.

19       74.    Either the construction of the pipeline was not visible to Plaintiffs and the Class

20   members at the time it was constructed, or it was not visually apparent to Plaintiffs and the Class

21   members that the pipeline was for the purpose of conveying petroleum products for the

22   commercial gain of Defendants as opposed to being for the structural or drainage needs of the

23   railroad attendant upon legitimate railroad operations.

24       75.    Prior to the California Court of Appeal's decision, Plaintiffs did not discover, and

25   did not know of, the facts that would have caused a reasonable person to suspect, both that they

26   had suffered harm and that such harm was caused by Defendants' wrongful conduct.

27       76.    Before the date of the California Court of Appeal's decision, Plaintiffs were not

28   entitled to begin and prosecute their claims herein.

**CONSPIRACY AND CONCERTED ACTION**

77.     In committing the wrongful acts alleged in this complaint, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.

78.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to:  (a) use, occupy, and profit from the subsurface real property owned by Plaintiffs and the Class members; (b) conceal from Plaintiffs and the Class members the facts regarding the presence of the pipeline on their real property; and (c) misrepresent the facts regarding the nature of Defendants' supposed legal rights to use, occupy, or profit from the subsurface of the railroad's rights-of-way.

79.     Defendants accomplished their conspiracy, common enterprise, or common course of conduct by entering into agreements with each other for the rental of portions of the subsurface under the railroad's rights-of-way and for the use, occupation, and profit from the same.

80.     Each of Defendants aided and abetted and rendered substantial assistance in the wrongs complained of in this complaint.  In taking such actions to substantially assist the commissions of the wrongdoing complained of in this complaint, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of its overall contribution to and furtherance of the wrongdoing.

**CLASS ACTION ALLEGATIONS**

81.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all landowners in California who own, in fee simple, land adjacent to and underlying a railroad easement under which the pipeline owned by the Pipeline Entities is located (the "Class").  Excluded from the Class are Defendants and their families, the federal and state governments, the officers, directors, and affiliates of Defendants, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

82.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained

1   through appropriate discovery, Plaintiffs believe that there are thousands of members in the Class.

2   83.   Prospective Class members can be identified from Defendants' own records and by

3   a search of the records of the Tax Assessor and Recorder of Deeds in a county-by-county search in

4   the State of California.  The putative class will consist of hundreds or thousands of parcels and

5   owners along the right-of-way and pipeline, including present and past owners who have sustained

6   damages as a result of Defendants' unlawful conduct.

7   84.   Plaintiffs' claims are typical of the claims of the members of the Class.  The

8   questions of law and fact common to the Class predominate over questions affecting only

9   individual class members.  These questions include, but are not limited to:

10       a.   Whether Union Pacific, in possession of merely a surface easement

11   pursuant to Congressional land grants, improperly and illegally purported to grant

12   subsurface easements for a pipeline without obtaining consent from Plaintiffs and the Class

13   members and without payment to Plaintiffs and the Class members.

14       b.   Whether Union Pacific improperly and illegally collected rents from the

15   Pipeline Entities for the right to transmit petroleum products through the Plaintiffs' and

16   the Class members' real property located in the subsurface beneath the railroad's surface

17   right-of-way.

18       c.   Whether Union Pacific's activities, specifically using or permitting the

19   Pipeline Entities to use the limited railroad purpose right-of-way to carry petroleum

20   through a subsurface pipe, was an improper and illegal use outside the scope of Union

21   Pacific's easement which terminated Union Pacific's easement or whether such pipeline

22   activity may be severed from the railroad use and itself terminated.

23       d.   Whether the Pipeline Entities improperly and illegally occupied the

24   subsurface of Plaintiffs' and the Class members' real property and transmitted petroleum

25   products through Plaintiffs' and the Class members' real property.

26       e.   Whether Defendants conspired with one another to deprive Plaintiffs and

27   the Class of their property rights.

28       f.   Whether the Class is entitled to declaratory relief.

15

g.      Whether the Class is entitled to damages for trespass.

h.      Whether the Class is entitled to quiet their title in the real property, free and clear of any claim of right by Defendants.

i.      Whether the Class is entitled to eject Defendants from the Class members' real property.

j.      Whether the Class is entitled to restitution and disgorgement of benefits unjustly obtained and retained by Defendants.

k.      Whether the Class is entitled to recover reasonable attorneys' fees, prejudgment interest, and the costs of suit.

85.     The claims of the named Plaintiffs are typical of the claims of the proposed Class. The claims of the named Plaintiffs, as well as the claims of the proposed Class members, arise from the same set of facts and are premised upon the same legal theories under federal law, namely the scope of Congressional land grants, and California property law.  The named Plaintiffs and the proposed Class members possess the same interests and they have suffered the same or similar injury — deprivation of their property rights.  Further, the named Plaintiffs and the proposed Class members seek the same remedy — compensation for damages for the diminution in value in their property rights and for recovery of benefits that have been unjustly obtained by Defendants from Plaintiffs and the Class members.

86.     Plaintiffs, as representative parties, will fairly and adequately protect the interests of the proposed Class.  Plaintiffs have engaged competent and experienced counsel who will properly protect and advance the interests of the Class.

87.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy.  Plaintiffs and the Class members have suffered irreparable harm as a result of Defendants' unfair and unlawful conduct.  Because of the size of the individual Class members' claims, few Class members could afford to seek legal redress for the wrongs claimed herein.  Absent a class action, the Class members will continue to suffer losses and the violations of law described herein will continue without remedy and Defendants will be permitted to retain the proceeds of their misdeeds.

CLASS ACTION COMPLAINT

88.     Further, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which could establish incompatible standards of conduct for Defendants or adjudication of individual claims would be dispositive of the claims of other Class members not parties to this lawsuit and could substantially impair or impede their ability to protect their interests.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (Against all Defendants)

89.     Plaintiffs incorporate by reference each and every preceding allegation.

90.     An actual dispute and controversy presently exists between Plaintiffs and Defendants concerning their respective rights and duties to real property situated in the subsurface beneath the railroad's right-of-way.

91.     Union Pacific contends that it holds sufficient legal right and title to purportedly grant easements to third parties, including the Pipeline Entities, to occupy the subsurface of the right-of-way, and to collect rents from such occupancy.

92.     The Pipeline Entities occupy the subsurface of the right-of-way, and derive a commercial benefit from said occupancy, without the consent of Plaintiffs and the Class and without payment of rents to Plaintiffs and the Class.

93.     A judicial determination of the rights and responsibilities of the parties over the real property in question is necessary and appropriate at this time.

### SECOND CAUSE OF ACTION
### TRESPASS
### (Against all Defendants)

94.     Plaintiffs incorporate by reference each and every preceding allegation.

95.     Union Pacific, by and through various Congressional land acts, acquired a surface easement and right-of-way solely for its railroad purposes.

96.     Union Pacific did not, by virtue of the Congressional land acts, acquire a fee simple interest in the subsurface below its surface right-of-way.

17

97.   Although Union Pacific acquired solely a surface easement for its railroad purposes only, Union Pacific purported to grant easements to the Pipeline Entities for the construction of the pipeline in the subsurface of Union Pacific's right-of-way.

98.   Union Pacific's intentional invasion of Plaintiffs' interest in the exclusive possession of their subsurface rights in their property is an intentional act of trespass.

99.   Union Pacific's continuing claim to possess the authority to grant easements in the subsurface underlying its right-of-way, to the Pipeline Entities and to others, is an ongoing invasion of Plaintiffs' fee ownership of the land without authority or permission and amounts to a continuing trespass on Plaintiffs' fee ownership in their land.

100.   The Pipeline Entities constructed, operated, and still transport petroleum products through their pipeline beneath the subsurface of Union Pacific's right-of-way, which is actually owned by Plaintiffs and the Class members.

101.   Because Union Pacific did not own or acquire Plaintiffs' fee ownership interest in the right-of-way, including Plaintiffs' ownership in the subsurface of the right-of-way, and because Union Pacific had no authority to violate Plaintiffs' fee ownership by purportedly granting easements to the Pipeline Entities, the Pipeline Entities' transmission of petroleum products through their pipeline is an intended invasion of Plaintiffs' fee ownership interest in the exclusive possession of their property.

102.   The Pipeline Entities' intentional invasion of Plaintiffs' interest in the exclusive possession of their subsurface rights in their property is an intentional act of trespass.

103.   The Pipeline Entities' transmission of petroleum products through the pipeline is an ongoing invasion of Plaintiffs' fee ownership of the land without authority or permission and amounts to a continuing trespass on Plaintiffs' fee ownership in their land.

104.   Defendants' trespass is continuing and should be abated.

105.   Additionally, or alternatively, Defendants' trespass is permanent, and has resulted in diminution of the value of Plaintiffs' real property.

106.   Due to Defendants' trespass, Plaintiffs have suffered damages, including the invasion of their exclusive rights to possess and occupy their subsurface property.

18

107.   Defendants' trespass is and was malicious, wanton, oppressive, and/or fraudulent in nature.

108.   Plaintiffs pray for an award of damages due to Defendants' trespass since the 1950s and for continuing trespass and for the diminution in value of their property.

### THIRD CAUSE OF ACTION
### EJECTMENT
### (Against all Defendants)

109.   Plaintiffs incorporate by reference each and every preceding allegation.

110.   This is an action to recover possession of real property located in California.

111.   Plaintiffs are the fee title holders of Union Pacific's railroad right-of-way, including the subsurface of the right-of-way.  Plaintiffs' fee simple ownership is burdened only by a limited easement for the use of the surface for railroad purposes only.

112.   Union Pacific's act of using or permitting the Pipeline Entities to use the limited railroad purpose right-of-way to carry petroleum through a subsurface pipe was an improper and illegal use outside the scope of Union Pacific's easement, which terminated Union Pacific's easement.

113.   The Pipeline Entities' use of the subsurface of the right-of-way to convey petroleum products may be severed from the railroad use and terminated.

114.   As the fee title holders of the subsurface, Plaintiffs have the exclusive right to possession of the subsurface of the right-of-way.

115.   Defendants have unlawfully occupied and are in possession of the subsurface beneath the railroad's right-of-way, without the consent of Plaintiffs.

116.   Defendants have failed and refused to cease their occupation of Plaintiffs' property.

117.   Plaintiffs have sustained damages as a direct and proximate result of Defendants' wrongful occupation of the subsurface of the railroad's right-of-way.

118.   Plaintiffs demand judgment for possession of the property and that they be awarded the rents, profits, the reasonable cost of repair or restoration of the property to its original condition, and other damages due to Defendants' unlawful possession of the property.

CLASS ACTION COMPLAINT

## FOURTH CAUSE OF ACTION
## QUIET TITLE
### (Against all Defendants)

119.    Plaintiffs incorporate by reference each and every preceding allegation.

120.    Plaintiffs are the fee title holders of Union Pacific's railroad right-of-way, including the subsurface of the right-of-way.  Plaintiffs' fee ownership is burdened only by a limited easement for the use of the surface for railroad purposes only.

121.    As the fee title holders of the subsurface, Plaintiffs have the exclusive right to possession of the subsurface of the right-of-way.

122.    Defendants have unlawfully occupied and are in possession of the subsurface beneath the railroad's right-of-way, without the consent of the Plaintiffs.

123.    Defendants have asserted purported legal claim and title to occupy, use, and possess the subsurface of the right-of-way.

124.    Union Pacific has asserted purported legal claim and title to grant easements in the subsurface of the right-of-way and to charge and collect rents from third parties, including the Pipeline Entities, for occupation, use, and possession of the subsurface of the right-of-way.

125.    The Pipeline Entities have asserted purported legal claim and right to use the subsurface to transmit petroleum products through an unlawfully constructed and maintained pipeline located within Plaintiffs' property.

126.    Defendants' claimed rights in the subsurface of the right-of-way are adverse to those of Plaintiffs and threaten Plaintiffs' quiet use and enjoyment of their fee interest in their real property.

127.    The claims of Defendants, and each of them, are without merit and Defendants have no right, title, or interest in the above-described real property or any part thereof.

128.    The Court should quiet title in the affected real properties solely in Plaintiffs' and the Class members' respective names, free and clear of any claimed interest by Defendants, and each of them.

///

///

20

### FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (Against all Defendants)

129.   Plaintiffs incorporate by reference each and every preceding allegation.

130.   Plaintiffs are the fee title holders of Union Pacific's railroad right-of-way.

131.   Plaintiffs' fee ownership of the right-of-way includes the subsurface and aerial rights of the right-of-way, and Plaintiffs' land is now burdened with a surface railroad easement for railroad purposes only.

132.   Union Pacific negotiated with the Pipeline Entities for rent payments by the Pipeline Entities for the use of the subsurface rights-of-way.  Union Pacific realized monetary benefits and rent payments from the Pipeline Entities for those subsurface rights, without payment to Plaintiffs.

133.   Union Pacific was aware that it received the benefit of the use of Plaintiffs' subsurface property rights without compensating Plaintiffs.

134.   Union Pacific does not own any title and does not have permission to use the subsurface or aerial rights above and below the right-of-way on the surface, but has received substantial monetary compensation and benefit without payment of just compensation to Plaintiffs, such that the retention by Union Pacific of payments made by the Pipeline Entities is unfair, unjust, and inequitable.

135.   Because Union Pacific has realized enormous monetary benefit for the improper use of Plaintiffs' subsurface rights in their property, Union Pacific has been unfairly and unjustly enriched and owes restitution to Plaintiffs for the use and rent collected by Union Pacific for illegal and unauthorized subsurface easements granted to the Pipeline Entities.

136.   Plaintiffs are entitled to damages for the value of all rents and monetary benefits received by Union Pacific for all improper and illegal easements granted to the Pipeline Entities since the 1950s.

137.   The Pipeline Entities, as successors to the original corporate affiliate of Union Pacific's predecessor, constructed a pipeline within Plaintiffs' property without notice to Plaintiffs, and without negotiating or paying for the right to use the subsurface of the right-of-way.

138.     Upon information and belief, the Pipeline Entities' predecessor-in-interest would have faced substantial additional cost and delay if it had fairly negotiated with and compensated the owners of the property at issue at the time the pipeline was constructed, and unjustly, unfairly, and inequitably received the benefit of the use of the property.

139.     The Pipeline Entities, as corporate affiliates of the railroad, occupied the subsurface of the railroad's right-of-way for decades by payment of rents that were less than the fair market value that would have been charged in an arm's-length transaction.

140.     By virtue of the wrongful acts herein described, the Pipeline Entities established a considerable market share and dominance of the oil and gas market, with more than 50% of their pipeline in the Western and Southwestern United States passing within Union Pacific's right-of-way.

141.     The Pipeline Entities realized enormous cost savings and profits derived from operating the pipeline through this territory without payment of just compensation to the property owners — *i.e.*, Plaintiffs and the Class members.

142.     The Pipeline Entities has enjoyed an unjust and unfair competitive advantage over other pipeline companies who properly paid for and secured the right to build their pipelines.

143.     The Pipeline Entities are aware of the benefits they have received from and at the expense of Plaintiffs and the Class members.

144.     Because the Pipeline Entities have realized enormous monetary benefit for the improper use of Plaintiffs' and the Class members' subsurface rights in their property, the Pipeline Entities have been unfairly and unjustly enriched and owe restitution to Plaintiffs and the Class members for the use and rent of Plaintiffs' and the Class members' real property.

145.     Plaintiffs and the Class members are entitled to damages for the value of all monetary benefits received by the Pipeline Entities for their improper and illegal occupation and use of the subsurface of the rights-of-way since the 1950s.

146.     Plaintiffs lack an adequate remedy at law.

147.     Defendants' conduct is and was malicious, wanton, oppressive, and/or fraudulent in nature.

148.    Plaintiffs pray for recovery of benefits that were unjustly obtained and retained by Defendants, for a constructive trust in favor of Plaintiffs to be placed upon the benefits and proceeds received by Defendants as a result of their violation of the Plaintiffs' rights.

### SIXTH CAUSE OF ACTION
### VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200 *et seq.*
### (Against all Defendants)

149.    Plaintiffs incorporate by reference each and every preceding allegation.

150.    The acts and practices of Defendants as alleged herein constitute unlawful business acts and practices within the meaning of CAL. BUS. & PROF. CODE § 17200 *et seq.*

151.    Defendants have engaged in "unfair" and/or "unlawful" business acts and practices as described above by, without limitation, depriving Plaintiffs of their legal rights in and to the subsurface real property and withholding rents from Plaintiffs who are the lawful owners of that property.  Defendants' unfair and unlawful business acts and practices, as described herein, constitute trespass and unjust enrichment, among other things.

152.    The above-described unlawful and unfair business acts and practices continue to this day.  Defendants have received unlawful benefits from Plaintiffs and have failed to provide full restitution and disgorgement of all ill-gotten monies either acquired or retained by Defendants as a result thereof, as appropriate under California law.

153.    Plaintiffs pray for the restitution of benefits and profits that were unfairly and/or unlawfully obtained by Defendants and an order enjoining Defendants from such unlawful and unfair conduct in the future pursuant to CAL. BUS. & PROF. CODE § 17203.

### SEVENTH CAUSE OF ACTION
### ACCOUNTING
### (Against all Defendants)

154.    Plaintiffs incorporate by reference each and every preceding allegation.

155.    As set forth above, Defendants have received unlawful benefits from Plaintiffs.

156.    Plaintiffs are entitled to an accounting from Defendants of these benefits and profits.

157.    Plaintiffs lack an adequate remedy at law.

23

158.     Plaintiffs pray for an accounting by Defendants of benefits and profits that were unfairly and/or unlawfully obtained from Plaintiffs by Defendants.

## EIGHTH CAUSE OF ACTION
### CIVIL CONSPIRACY
**(Against all Defendants)**

159.     Plaintiffs incorporate by reference each and every preceding allegation.

160.     By and through the wrongful acts described in this complaint, Defendants, and each of them, have combined, associated, agreed, conspired, mutually undertaken, and concerted together for the purpose of injuring Plaintiffs and the Class.

161.     By and through the wrongful acts described in this complaint, Defendants, and each of them, have attempted to procure the participation, cooperation, agreement, or other assistance of other persons to enter into a combination, association, agreement, mutual understanding, or concert for the purpose of injuring Plaintiffs and the Class.

162.     By and through the wrongful acts described in this complaint, Defendants, and each of them, have combined, associated, agreed, conspired, mutually undertaken, and concerted together for the purpose of intentionally invading Plaintiffs' and the Class members' interests in the exclusive possession of their subsurface rights in their property in an intentional act of trespass.

163.     Defendants' acts complained of in this count have been undertaken in order to serve Defendants' personal pecuniary interests, including, in Union Pacific's case, collecting rent from the Pipeline Entities that it had no right to collect, and, in the Pipeline Entities' case, developing a commanding share of the oil and gas market through the use and occupancy of the pipeline without the consent of Plaintiffs and the Class and without compensation to them.

164.     Defendants' acts complained of in this count have been undertaken without justification.

165.     Plaintiffs and the Class have been injured as a direct and proximate result of the acts complained of herein, and have suffered damages in an amount to be determined at trial.

///

///

24

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, and on behalf of the general public, pray for judgment against Defendants as follows:

A.    For an order certifying this class as a class action and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

B.    For a declaration that (1) Defendant Union Pacific lacks sufficient legal right or title in the subsurface of its right-of-way to grant easements or to collect rents associated with the occupancy of the subsurface, and (2) Defendant Pipeline Entities lack sufficient legal right or title to occupy the subsurface of the railroad's right-of-way;

C.    For an award of damages, restitution, and/or disgorgement of benefits or profits according to proof;

D.    For an award of exemplary damages based on the second cause of action for trespass and the fifth cause of action for unjust enrichment;

E.    For possession of the subsurface real property;

F.    For an order quieting title in the subsurface real property in Plaintiffs' and the Class members' respective names, free and clear of any claimed interest by Defendants;

G.    For a constructive trust in favor of Plaintiffs to be placed upon the benefits and proceeds received by the Defendants;

H.    For an accounting by Defendants of all benefits and profits that were unfairly and/or unlawfully obtained from Plaintiffs and the Class members by Defendants;

I.    For reasonable attorneys' fees;

J.    For pre-judgment interest;

K.    For costs of suit; and

L.    For such other and further relief as the Court deems just and proper.

///

///

///

///

CLASS ACTION COMPLAINT

1

### DEMAND FOR TRIAL BY JURY

2

Plaintiffs demand a trial by jury with respect to all claims so triable.

3

Dated:  July 1, 2015

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov


_____s/ Francis A. Bottini, Jr._____
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:   (858) 914-2001
Facsimile:   (858) 914-2002
E-mail:      fbottini@bottinilaw.com
             achang@bottinilaw.com
             ykolesnikov@bottinilaw.com

*Attorneys for Plaintiffs*

26